## UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF ALASKA

In the Matter of the Search of items seized at 7012 Cape Lisburne Loop:

- iPhone, logged under FBI evidence item 1B85, seized by FBI while executing a search warrant on 12/09/2015 (Device #1)

- iPhone model A1332, logged under FBI evidence item 1B98, seized by FBI while executing a search warrant on 12/09/2015 (Device #2)

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. 3:16-mj-0014-DMS

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
**See Attachment A.**

located in the District of <u>Alaska</u>, there is now concealed *(identify the person or describe the property to be seized)*:
**See Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
   X Evidence of a crime;
   X contraband, fruits of crime, or other items illegally possessed;
   X property designed for use, intended for use, or used in committing a crime;
   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is in relation to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 846 and 841 | Conspiracy to Possess with the Intent to Distribute and Possession with the Intent to Distribute Controlled Substances |
| 18 USC §§ 1956 and 1957 | Conspiracy to Engage in Money Laundering, Money Laundering, Structuring Transactions |
| 18 USC § 924(c) | Possession of Firearms in Furtherance of drug trafficking or crime of violence |
| 18 USC § 1961 et. seq. | Racketeer Influenced and Corrupt Organizations Act ("RICO"), and conspiracy to commit RICO |
| 18 USC § 1959 | Violent Crimes in Aid of Racketeering |
| 18 USC § 922(g)(1) | Felon in Possession of firearms |

The application is based on these facts:
**See attached affidavit.**

    X   Continued on the attached sheet.

☐   Delayed notice of \_\_\_ days (give exact ending date if more than 30 days: \_\_\_\_) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

**Signature Redacted**

_____
*Applicant's Signature*

_____
Michael Watson, FBI
*Printed name and title*

Sworn to before me and signed in my presence

Date: 2/3/16

/S/ DEBORAH M. SMITH
CHIEF U.S. MAGISTRATE JUDGE
SIGNATURE REDACTED
_____
*Judge's Signature*

City and State: Anchorage, AK

_____
Magistrate Judge Smith
*Printed name and title*

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| IN THE MATTER OF THE SEARCH OF various smart phones, cellular phones, computers/tablets, electronic data storage devices/mediums, cameras, and social media accounts, set forth in Attachment A, for the items set forth in Attachment B. | Case No. 3:16-mj-0014-DMS<br>3:16-mj-0015-DMS<br>3:16-mj-0016-DMS<br>3:16-mj-0017-DMS<br>3:16-mj-0018-DMS<br>3:16-mj-0019-DMS<br>3:16-mj-0027-DMS<br>3:16-mj-0035-DMS<br>3:16-mj-0036-DMS<br>3:16-mj-0037-DMS<br>3:16-mj-0038-DMS<br>3:16-mj-0039-DMS<br>3:16-mj-0040-DMS<br>3:16-mj-0041-DMS<br>3:16-mj-0042-DMS<br>3:16-mj-0043-DMS<br>3:16-mj-0044-DMS<br>3:16-mj-0045-DMS<br>3:16-mj-0046-DMS<br>3:16-mj-0047-DMS |
|---|---|

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Federal Bureau of Investigations Special Agent Michael Watson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND BACKGROUND

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for seven search warrants authorizing the search of 19 smart phones, 9 cellular phones, 12 computers/tablets, 6 electronic data storage devices/mediums, and two cameras, all of which were previously seized on December 9, 2015, by the FBI, pursuant to federal search warrants issued for various Anchorage locations, as well as one consent search for a storage facility, as detailed below. I also seek search warrants for a Facebook account and Instagram account, which I believe will contain evidence of crimes and the location of a fugitive. I have separated the devices by the locations where

1

FEB – 3 2016

they were seized, and request separate warrants because of the different features of each device category (smart phones, cellular phones, computers, storage devices, cameras, Facebook and Instagram accounts). Below are the electronic devices recovered in the searches, which were seized by the FBI on December 9, 2015 (with one exception noted below), at the following locations:

A. **7012 Cape Lisburne Loop:**
   1. **Smart Phones:** Case No. 3:16-mj-0014-DMS
       i. Device #1: iPhone , logged under FBI evidence item 1B85;
       ii. Device #2: iPhone model A1332, logged under FBI evidence item 1B98.

B. **1109 Medfra, Apt. #7:**
   1. **Smart Phones:** Case No. 3:16-mj-0015-DMS
       i. Device #3: iPhone 5s model A1633, logged under FBI evidence item 1B114;
       ii. Device #4: iPhone with pink case, logged under FBI evidence item 1B129;
       iii. Device #5: HTC cell phone, logged under FBI evidence item 1B137.
   2. **Cellular Phones:** Case No. 3:16-mj-0016-DMS
       i. Device #6: One black AT&T flip phone, logged under FBI evidence item 1B115;
       ii. Device #7: LG cell phone, logged under FBI evidence item 1B153.
   3. **Computers/Tablets:** Case No. 3:16-mj-0017-DMS
       i. Device #8: Mac laptop, logged under FBI evidence item 1B128.
   4. **Electronic data storage devices/media:** Case No. 3:16-mj-0018-DMS
       i. Device #9: SanDisk thumbdrive 4GB, logged under FBI evidence item 1B147;
       ii. Device #10: Kodak 2GB SD card, logged under FBI evidence item 1B152;
       iii. Device #11: 8GB USB drive, logged under FBI evidence item 1B163.
   5. **Cameras:** Case No. 3:16-mj-0019-DMS
       i. Device #12: Samsung digital camera, logged under FBI evidence item 1B136;
       ii. Device #13: HP Photosmart camera, logged under FBI evidence item 1B151.



FEB - 3 2016

**C.** <u>1012 W. 53rd Avenue, Apt 4:</u>

    1. **<u>Smart Phones</u>:** Case No. 3:16-mj-0027-DMS

        i. Device #14: iPhone FCC ID BCGE2817A, logged under FBI evidence item 1B183;

        ii. Device #15: iPhone blue IMEI 357990057964083, logged under FBI evidence item 1B184;

        iii. Device #16: iPhone gold, IMEI 364444063588943, logged under FBI evidence item 1B185.

    2. **<u>Cellular Phones</u>:** Case No. 3:16-mj-0035-DMS

        i. Device # 17: Alcatel cell phone IMEI 013303007471025, logged under FBI evidence item 1B168.

    3. **<u>Computers/Tablets</u>:** Case No. 3:16-mj-0036-DMS

        i. Device #18: Lenovo laptop computer, S/N CB22389838, logged under FBI evidence item 1B186;

        ii. Device #19: RCA tablet, logged under FBI evidence item 1B169.

**D.** <u>400 Turpin Street, Apt. #3:</u>

    1. **<u>Smart Phones</u>:** Case No. 3:16-mj-0037-DMS

        i. Device #20: iPhone cracked, model and serial number unreadable, logged under FBI evidence item 1B206;

        ii. Device #21: iPhone M/N A1633 FCC ID: BCG-E2946A, logged under FBI evidence item 1B216;

        iii. Device #22: Samsung Note 4 Model: SM-N910T S/N RF8FB0N9XWA, logged under FBI evidence item 1B220.

    2. **<u>Computers/Tablets</u>:** Case No. 3:16-mj-0038-DMS

        i. Device #23: Macbook Air - Silver A1466 SN# C0ZMQSG7G085, logged under FBI evidence item 1B221;

        ii. Device #24: Gateway laptop model: NV55C SN: LXWSG020040333973D1601, logged under FBI evidence item 1B219;

        iii. Device #25: Windows RT Tablet Model: 1516 0243165309521/64GB, logged under FBI evidence item 1B205;

FEB - 3 2016

iv.  Device #26:  iPad Model: A1432 Serial: F7QM312NFP84, logged under FBI evidence item 1B207;

v.  Device #27:  iPad silver back/ shattered screen AB95  SN: DMRHISPBDFHW, logged under FBI evidence item 1B209.

3.  **Electronic data storage devices/mediums**: Case No. 3:16-mj-0039-DMS

i.  Device #28:  Blk SanDisk thumbdrive  SDCZ60-064G, logged under FBI evidence item 1B223.

E.  **1108 E. 12th Avenue:**

1.  **Smart Phones:** Case No. 3:16-mj-0040-DMS

i.  Device #29:  Samsung Model SGH-1747M  S/N R21CA6SEYAX, logged under FBI evidence item 1B252;

ii.  Device #30:  iPhone Model A1349, logged under FBI evidence item 1B254;

iii.  Device #31:  iPhone Model A1332, logged under FBI evidence item 1B255;

iv.  Device #32:  Black Samsung Galaxy 5, logged under FBI evidence item 1B261;

v.  Device #33:  White Samsung cell phone, logged under FBI evidence item 1B262;

vi.  Device #34:  Samsung Model SGH-S150G, S/N R21F43B3PEF, logged under FBI evidence item 1B269;

vii.  Device #35:  ZTE cell phone Model Z222 S/N 327B50211A3F, logged under FBI evidence item 1B271;

viii.  Device #36:  Black 'Verykool' cell phone, logged under FBI evidence item 1B260.

2.  **Cellular Phones:** Case No. 3:16-mj-0041-DMS

i.  Device #37:  Maxwest cell phone, logged under FBI evidence item 1B258;

ii.  Device #38:  Samsung 'FM radio' cell phone, logged under FBI evidence item 1B263.



FEB - 3 2016

4

**F. 3830 Parsons, #3:**

1. **Computers/Tablets**: Case No. 3:16-mj-0042-DMS
    i. Device #39: Dell Inspiron 6400 laptop, service tag D73MN91, logged under FBI evidence item 1B235;
    ii. Device #40: Dell laptop Model PP07L. Service tag 2NXSH31, logged under FBI evidence item 1B246;.
    iii. Device #41: Ipad mini, logged under FBI evidence item 1B247.
2. **Electronic data storage devices/mediums**: Case No. 3:16-mj-0043-DMS
    i. Device #42: Toshiba hard drive, logged under FBI evidence item 1B238;
    ii. Device #43: 8GB red PNY flash drive, logged under FBI evidence item 1B244.

**G. 405 Boniface Pkwy, Container #554:**

1. **Cellular Phones:** Case No. 3:16-mj-0044-DMS
    i. Device #44: Samsung flip phone M/N: SCH-R261 FCC ID: A3LSCHR261A, logged under FBI evidence item 1B77;
    ii. Device #45: LG flip phone S/N: 307CYPY729648, logged under FBI evidence item 1B78;
    iii. Device #46: Tell Me SOS phone FCC ID: ZVP-F210, logged under FBI evidence item 1B79;
    iv. Device #47: Nokia phone cracked screen no serial number, logged under FBI evidence item 1B80.

**H. 2009 Chevy Silverado:**

1. **Computers/Tablets**: Case No. 3:16-mj-0045-DMS
    i. Device #48: Toshiba Laptop - SN# 48257414K, located on January 26, 2016, by FBI while inventorying the 2009 Chevy Silverado pursuant to a seizure warrant resulting from the indictment in this case.

**I. Social Media Accounts account**: Case No. 3:16-mj-0046-DMS &3:16-mj-0047-DMS

1. Facebook account: Itsyaman Mitchbitxch, account number 100001502487094

5

2. Instagram account: Instagram account: ROSEWOOD_EDITION, Real Pompton Of Bompton, account number 354977756.

2.      I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have been employed by the FBI as a Special Agent since September, 2008. I am currently assigned to the Anchorage, Alaska Field Division, where I am a member of the FBI Safe Streets Task Force (SSTF). Prior to my employment with the FBI, I served as a Revenue Officer with the Internal Revenue Service in Denver, Colorado, from June 2007 to September 2008, and as a Certified Public Accountant with a public firm in Denver, Colorado, from August 2002 until June 2007.

3.      Prior to my assignment to the Anchorage Field Division, I was assigned to the Las Vegas Field Division, where I was on the Violent Crimes/Major Offenders squad, and later the Organized Crime squad, where I worked on investigations involving southwest border narcotics trafficking, focusing primarily on Latin American cartels and cross border gangs. These investigations generally were enterprise- type investigations focusing on groups of individuals and their related illegal activities. I would also assist the investigations that were being conducted into local domestic gang activity as well.

4.      As part of my FBI duties, I investigate criminal violations of federal law, to include federal sex trafficking and prostitution offenses, racketeering offenses, and the Controlled Substances Act. Throughout my law enforcement career, I have received training in the enforcement of federal law. My training and experience has involved, among other things: (1) the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the criminal activity and of the laundering and concealment of proceeds of criminal activity; (2) surveillance; (3) analysis of documentary and physical evidence; and (4) the execution of search warrants. I have also received training in investigations involving the interception of wire communications. I have been assigned and worked investigations to include, southwest border cartel and drug related matters, local and national gang investigations, violent crimes against children, as well as complex financial crimes.



6

FEB − 3 2016.

## Narcotics Trafficking

5.     Based on my training, experience and participation in these and other financial/drug trafficking investigations, and based on my conversations with other experienced law enforcement agents, officers, and prosecutors with whom I work, I know the following:

a.  In my experience, I have found that the distribution of controlled substances is frequently a continuing activity over months and years.  Persons involved in the trafficking of illegal controlled substances typically will obtain and distribute controlled substances on a regular basis, much as a distributor of a legal commodity would purchase stock for sale.  Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product.

b.  It has been my experience that drug traffickers keep records of their illegal activities not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances.  The records are kept  in order to maintain contact with criminal associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money or might owe someone else money.  Such records may be found in the form of text messages on cell phones, or emails on targets' computers, tablets, or smart phones.

c.  It is common for members of drug trafficking organizations to maintain records evidencing their illegal activities including books, ledgers, receipts, notes and other papers relating to the transportation, ordering, possession sale and distribution of drugs and the collection and transportation of drug proceeds.  I also know that the aforementioned records are frequently maintained in the drug trafficker's residence and sometimes in the traffickers' vehicle(s), computers, tablets, or smart phones.

d.  I know that evidence of excessive wealth is probative evidence of crimes involving greed, to include the distribution of controlled substances.  Therefore, receipts showing the expenditure of large sums of money and/or the expensive assets themselves are evidence of drug trafficking.  I also know that drug traffickers commonly keep the expensive assets themselves and/or documentation of the purchase of the asset (receipts, warranty cards, etc.)

7

in or about their residences, and sometimes documentation of these assets in their vehicles, businesses, smart phones, tablets, or computers.

e. It is increasingly common for members of drug trafficking organizations to utilize direct cash deposits into a co-conspirator's bank accounts to facilitate the movement of US currency throughout the trafficking organization's area of operations. I know that members of drug trafficking organizations will utilize nominee depositors to disguise the origination of the funds and to break up the amount being deposited by any one person. I know that the actual owner of the currency will commonly provide the nominee depositor with hand-written information concerning the intended recipients name and account number and amounts of money to be deposited. I also know that, in an attempt to keep track of the proceeds, it is common for the drug traffickers and/or nominee depositors to maintain copies of the deposit slips. I also know that the aforementioned items are frequently maintained in the drug trafficker's and/or nominee depositor's residence, businesses, or vehicles. In addition, drug traffickers can keep such records on their smart phones, tablets, or computers

f. It is common for members of drug trafficking organizations to utilize express parcel delivery companies, (i.e. Federal Express, United Parcel Service, DHL, and US Postal Service Express Mail) to facilitate the movement of controlled substances and US currency throughout the trafficking organization's area of operations. I also know that, in an attempt to keep track of the packages and their contents, it is common for the trafficker to maintain copies of the shipping receipts and tracking numbers. I know that members of drug trafficking organizations will utilize nominee senders/recipients to disguise the origination and destination of the packages. I know that the actual owner of the drugs/currency will commonly provide the nominee sender with hand-written information concerning the intended recipient's name and address. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence, businesses, and vehicles. Drug traffickers also frequently track packages using their smart phones, tablets, or computers, and thus analysis of these devices can provide evidence of drug trafficking and money laundering violations.

g. It is common for members of drug trafficking organizations to utilize fraudulent identification, in order to purchase airline tickets, send wire transfers, rent residences and

8

storage facilities and subscribe for telephone/cellular telephone service. I also know that it is common for drug traffickers to keep fraudulent identification nearby and easily accessible to facilitate their flight upon the discovery of their illegal activities by law enforcement. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence, businesses, or vehicles. Records concerning the purchase of airline tickets, rental contracts, and telephone / cellular service are frequently found on the smart phones, tablets, or computers.

h. It is common for drug trafficking organizations involved in the distribution of controlled substances to maintain equipment and supplies (i.e. scales, baggies, cutting agents) on hand over a lengthy period of time. At times, certain retail stores provide customers with loyalty cards that can track a customer's purchases. Frequently, these stores send emails to the members of their loyalty programs that can be found on drug traffickers' computers, tablets, and smart phones.

i. It is common for members of drug trafficking organizations to attempt to recruit couriers to transport drugs and/or US currency throughout the trafficking organization's area of operations. I know that often times the couriers handler will provide the courier with hand-written notes regarding travel itinerary, hotel information and contact telephone numbers prior to the courier departing on the trip to transport drugs and/or money. I also know that often times the organizations will pay a flat rate (i.e. $2,000 per kilogram of cocaine) plus expenses for the couriers. Therefore, often times the couriers will keep handwritten itemized lists of expenses and/or receipts, in order to be reimbursed. I also know that the aforementioned items are frequently maintained in the courier's residence or residences and vehicles of members of the drug trafficking organization. In addition, records of airline and hotel purchases are frequently found in email on drug traffickers' smart phones, tablets, or computers. Evidence of visiting travel websites can often be found through forensic analysis of these devices.

j. It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their co-conspirators with controlled

9

substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). I also know that the aforementioned items are frequently maintained in the drug trafficker's residence or business, or in their computers, tablets, smart phones, and portable media players.

k. It is common for members of drug trafficking organizations, in an attempt to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards. I know that often times the only way to connect a subject with a particular pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker or his residence. Analysis of these pre-paid cellular phones often provide evidence of a drug trafficker's customers and suppliers, as well as accomplices. This information typically can be found in the address books, call logs and text messages of wireless cellular telephones, smart phones, computers, tablets and portable media players.

l. It is common for members of a drug trafficking organization to attempt to legitimize their profits from the distribution of drugs. To accomplish these goals, drug traffickers utilize foreign and domestic banks and the bank's attendant services to include cashier's checks, safe deposit boxes, and money drafts. Drug traffickers will also utilize the purchase/sale of real estate to legitimize their profits. I also know that the records of the aforementioned transactions are frequently maintained in the drug trafficker's residence, business, or vehicles, and also stored on computers and tablets of drug traffickers.

m. It is common for members of drug trafficking organizations to utilize businesses, both real and fictitious, to conceal both the distribution of drugs as well as to conceal the source of their illegal income. It is common for drug traffickers to possess business licenses and articles of incorporation for these businesses, even if the businesses exist only on paper. I also know that these records and documents are frequently maintained in the drug trafficker's residence or business, as well as on drug traffickers' computers and tablets.



10

## Gang Membership

6.     As set forth more fully below, this investigation pertains to a group of individuals who are associated with an enterprise in fact, the Fairview M.O.B., also known as "326 M.O.B," which I believe is a criminal street gang. Therefore, I request permission to seize evidence of membership in this gang, to include photographs, pictures, address books, papers, drawings or miscellaneous writings, or objects, or graffiti depicting gang members' names, initials, logos, monikers, slogans, or containing mention of street gang membership affiliation, activity, or identity, as it is my experience that these street gang members are known by street names or monikers to their fellow gang members, and that they frequently write their names or monikers of their associates on miscellaneous items, including their social media accounts, walls, furniture, and vehicles. From my participation in gang investigation, and my discussions with other agents and investigators who specialize in gang investigations, I know the following:

    a.  Most gang members keep photographs and photograph albums (that may be in hard copy or digital form) in which are depicted (1) fellow gang members who are posing and giving hand gang signs that indicate gang identity or affiliation, (2) gang members or associates posing with weapons, particularly firearms that are often used for criminal activities, (3) gang members or associates posing beside vehicles that are occasionally used during the commission of crimes, and (4) gang members or associates posing at locations that are known to be specific gang hangouts; any newspaper clippings tending to relate details or reference to any crime or crimes of violence, as gang members occasionally maintain scrapbooks or newspaper articles that describe crimes committed by or against their gang.

11

FEB - 3 2016

b. Most gang members maintain address / contact books, in hard copy or digital form, that reference address and/or telephone numbers of persons who may later be determined to belong to or be affiliated with any street gangs, because gang members frequently maintain the current phone numbers or addresses of fellow gang members with whom they associate.

c. evidence of gang membership or affiliation with any street gang is important, as it may suggest motive for the commission of the crimes committed in the instant case, and it may provide evidence which tends to identify other persons who may have knowledge of or be involved in the commission of the crimes in the instant case, or it may tend to corroborate information given by other witnesses.

d. The evidence of gang affiliation set forth above is not normally disposed of after the commission of crimes and that it will, therefore, likely still be found in the locations to be searched, to include social media accounts and electronic devices.

## Technical Terms

7.    Based on my training and experience, as well as my communications with law enforcement with specialized training in these types of technology, I use the following technical terms to convey the following meanings:

a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending,

FEB – 3 2016

receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

FEB – 3 2016

13

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

8.      Based on my training, experience, and research, I know that the following devices have the following capabilities:

a. Smart Phones: wireless telephone, internet browser, digital camera, portable media player, GPS navigation device, email, word processing, and PDA;

14

b. Cellular telephones: wireless telephone, digital camera.

c. Computers / Tablets: internet browser, digital camera, portable media player, GPS Navigation device, email, word processing, and PDA.

f. Electronic data storage: photographs, audio and video files, as well as computer backup.

## Electronic Devices and Forensic Examination

**9.** Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

**10.** Based on my knowledge, training and experience, there is probable cause to believe that things that were once stored on the electronic devices may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, and based upon my communications with law enforcement personnel with specialized technical expertise, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a

15

FEB - 3 2016

computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

11.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

16

**12.** The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.

**13.** Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

**14.** Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

FEB – 3 2016

17

## Social Media Accounts

**15.** As explained for specifically below, information stored in connection with Instagram and Facebook accounts may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a social media user's account activity, IP log, stored electronic communications, and other data retained by the provider can indicate who has used or controlled the relevant accounts. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the Instagram or Facebook accounts at a relevant time. Further, the account activity can show how and when the account was accessed or used. For example, as described below, each of these providers logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Instagram access, use, and events relating to the crime under investigation.

**16.** Additionally, Instagram and Facebook build geo-location into some of their services. Geo-location allows, for example, users to "tag" their location in posts and Instagram or Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Last, social media account activity may provide relevant insight into the account owner's state of mind as it relates to the offense under investigation. For example, information on the

FEB - 3 2016

account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

17.     Social networking providers like Instagram and Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, users may communicate directly with the provider about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

18.     Investigators and investigative support personnel with the FBI are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook/Instagram are not. It would be inappropriate and impractical for investigators to search the vast computer network of Facebook/Instagram for the relevant accounts and then to analyze the contents of those accounts on the premises of Facebook. This would impact the business of Facebook/Instagram.

19.     Therefore , I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs and any other content from the Facebook and Instagram accounts described in the pertinent attachment A.

20.     In order to accomplish the objective of the search warrant with minimal interference to the Facebook / Instagram business, to protect the rights of the subjects of the investigation and to effectively pursue this investigation, the affiant request the authority be granted for Facebook/Instagram to make a

digital copy of the entire contents of the accounts. The copy will be provided to the affiant or authorized personal. The copy will then be analyzed to identify communications and other data subject to seizure pursuant to the pertinent Attachment B. Relevant data will be copied to separate media and the original media will be sealed and maintained to establish authenticity if necessary.

21.     Specific information about the attributes and retention policies of Instagram and Facebook are set forth below. This information has been gathered from various sources, including other investigators and the relevant provider's "Privacy Policy" and law enforcement guides.

## Instagram

22.     Instagram owns and operates a free-access social-networking website of the same name that can be accessed at http://www.instagram.com. Instagram allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and other information. Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device. Instagram is owned by Facebook.

23.     Instagram permits users to post photos to their profiles on Instagram and otherwise share photos with others on Instagram, as well as certain other social-media services, including Flickr, Facebook, and Twitter. When posting or sharing a photo on Instagram, a user can add to the photo: a caption; various "tags" that can be used to search for the photo (e.g., a user made add the tag #vw so that people interested in Volkswagen vehicles can search for and find the photo); location information; and other information. A user can also apply a variety of "filters" or other visual effects that modify the look of the posted photos. In addition, Instagram allows users to make comments on posted photos, including photos that the user posts or photos posted by other users of Instagram. Users can also "like" photos

20

24.    Upon creating an Instagram account, an Instagram user must create a unique Instagram username and an account password. This information is collected and maintained by Instagram.

25.    Instagram asks users to provide basic identity and contact information upon registration and also allows users to provide additional identity information for their user profile. This information may include the user's full name, e-mail addresses, and phone numbers, as well as potentially other personal information provided directly by the user to Instagram. Once an account is created, users may also adjust various privacy and account settings for the account on Instagram. Instagram collects and maintains this information.

26.    Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public. Friends on Instagram may come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles. Instagram collects and maintains this information.

27.    Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user. Users may also "unfollow" users, that is, stop following them or block the, which prevents the blocked user from following that user.

28.    Instagram allow users to post and share various types of user content, including photos, videos, captions, comments, and other materials. Instagram collects and maintains user content that users post to Instagram or share through Instagram.

29.    Instagram users may send photos and videos to select individuals or groups via Instagram Direct. Information sent via Instagram Direct does not appear in a user's feed, search history, or profile.

FEB – 3 2016

30.     Users on Instagram may also search Instagram for other users or particular types of photos or other content.

31.     For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app. Among the log file information that Instagram's servers automatically record is the particular web requests, any Internet Protocol ("IP") address associated with the request, type of browser used, any referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

32.     Instagram also collects and maintains "cookies," which are small text files containing a string of numbers that are placed on a user's computer or mobile device and that allows Instagram to collect information about how a user uses Instagram. For example, Instagram uses cookies to help users navigate between pages efficiently, to remember preferences, and to ensure advertisements are relevant to a user's interests.

33.     Instagram also collects information on the particular devices used to access Instagram. In particular, Instagram may record "device identifiers," which includes data files and other information that may identify the particular electronic device that was used to access Instagram.

34.     Instagram also collects other data associated with user content. For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of a photo and which may include latitude and longitude information, comments on photos, and other information.

FEB - 3 2016

## Facebook

35.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

36.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

37.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

38.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access

23

FEB - 3 2016

to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

39.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

40.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

41.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores

copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

42.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

43.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

44.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

45.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

46.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

25

47.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

48.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

49.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

50.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

51.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would

26

reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

## RELEVANT STATUTES

**52.** The investigation has revealed probable cause that the targets are involved in the following violations and that there is reasonable cause to believe that evidence of these offenses will be found at the residences to be searched:

a. Title 21, United States Code, Section 841(a) (1) and 846, the Distribution of Controlled Substances, the Possession of Controlled Substances with Intent to Distribute, as well as the conspiracy to commit those violations;

b. Title 18 United States Code Sections 1956, 1957, Money Laundering, and conspiracies to do the same and aiding and abetting the same;

c. Title 18, United States Code Section 924(c), Possession of a firearm in furtherance of drug trafficking or violent criminal offense;

d. Title 18 United States Code Sections 1961 et. seq., Racketeer Influenced and Corrupt Organizations ("RICO"), including conspiracy to commit RICO;

e. Title 18 United States Code Section 1959, Violent Crimes in Aid of Racketeering Activities ("VCAR"); and

f. Title 18 United States Code Section 922(g)(1), felon in possession of firearms.

## PROBABLE CAUSE

The following information is based on my own knowledge, from other law enforcement agents and officers, or from specific sources as set forth:

27

FEB − 3 2016

53.     The Federal Bureau of Investigation Anchorage Safe Streets Task Force (SSTF) has been investigating the activities of a criminal street gang known as the "Fairview M.O.B."(Member of Bloods), also known as the "326 Bloods", which is an association in-fact enterprise. Based upon the investigation to date, the members of the enterprise engage in shootings, murders, drug trafficking, money laundering, weapons possession, burglary, and sex trafficking of women. The purpose of these crimes is to promote the continued existence of the enterprise by supporting its members financially. The members of the enterprise function as a continuing unit to promote the reputation of the enterprise, as well as to protect and defend its members and "turf" from all other gangs and threats.   The enterprise is also affiliated with "All Da Time Ent.," "YNE",  and "Zaya's First Class Entertainment, which films videos of its members attempting to produce and promote rap music. In these videos, which are posted on Youtube, members rap and talk about their involvement in the enterprise.   The criminal activities of the enterprise also give credibility to the enterprise's music endeavors. Further, members of the enterprise travel between Alaska and Compton, California, for the purpose of obtaining controlled substances and launder the proceeds from the sale of these controlled substances through the banking system, which affects interstate commerce.

54.     It should be noted that the structure of the Fairview M.O.B. appears to be flexible, with no readily ascertainable "chain of command." However, I am informed by Assistant U.S. Attorney Frank Russo that a formal structure is not required to allege a RICO enterprise. *See Odom v. Microsoft Corp.,* 486 F.3d 541 (9th Cir. 2007) (en banc) (explicitly overruling prior cases that indicate that a RICO enterprise must have some structure beyond what is necessary to commit the alleged racketeering acts); *Boyle v. United States*, 556 U.S. 938, 948 (2009) ("Such a group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles;

28

FEB - 3 2016

different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.")

55.   Some (but not all) members of the organization, their general roles, and their residence information are set forth below:

   a.   Isaiah Holloway a/k/a "Z" or "Zaya": "Zaya" appears to be a leader of the Fairview M.O.B.  He has close connections to members of the "Campanella Park Piru" Bloods in Compton, California.   On December 9, 2015, "Z" was arrested at 7012 Cape Lisburne Loop, where agents executed a federal search warrant.   As set forth below, several items of evidence were found at this address and authorization to search these items is sought herein.

   b.   Lamont Moore a/k/a "Moose": "Moose" is also a member of the Campanella Park Piru Bloods and travels between California and Anchorage. According to various sources, Moose is an organizer of the gang, distributes narcotics and is an enforcer. Moose is a convicted felon and a close associate of "Zaya."

   c.   Dearon Walton a/k/a "Hop" or "Mitch":  Walton is also a member of the Campanella Park Piru Bloods.  He has traveled to Anchorage to distribute narcotics and appears to have a leadership role the Fairview M.O.B.  Walton is a convicted felon.  Walton has not yet been arrested and there is an active warrant for his arrest.  Nonetheless, as set forth below, he appears to be posting on Instagram and Facebook.  Walton's Facebook account name is "Itsyaman Mitchbitxch," and his Instagram account name is "Rosewood_Edition, Real Pompton of Bompton."

   d.   Ishmael Holloway a/k/a "Ish" : "Ish" is the younger brother of "Zaya".  Ish distributes narcotics for the enterprise and has participated in shootings.  "Ish" has traveled to California where he produced rap videos with other members of the Campanella Park Piru.   On

FEB - 3 2016

December 9, 2015, a federal search warrant was executed at the then-residence of ISHMAEL HOLLOWAY, located at 400 Turpin apartment #3.   As set forth below, several items of evidence were found at this address and authorization to search these items is sought herein.

e.   Dorian Topps a/k/a "Fairview Money" : Topps distributes drugs for the enterprise and was involved in a shooting in May with "Ish."   Topps is a convicted felon.

f.   Michael Reynold a/k/a "Boogie": "Boogie" distributes drugs for the enterprise and has participated in shootings.   Reynold is a convicted felon and is currently in jail on a pending homicide charge related to a retaliatory shooting for the enterprise.

g.   Felton Reynold, Jr., a/k/a "Fairview Jun": "June" is the brother of Boogie, and is a distributor of drugs for the enterprise.   On December 9, 2015, "Jun" was arrested at 1108 East 12th Ave, where several controlled purchases of illegal narcotics had been conducted by the FBI Safe Streets Task Force as recently as 12/02/2015.   Agents executed a federal search warrant at this address, and, as set forth below, several items of evidence were found at this address and authorization to search these items is sought herein.

h.   Angelo Charter:  Charter distributes drugs for the enterprise.   On December 9, 2015, he was arrested at 1109 Medfra Street apartment #7, where agents executed a federal search warrant.   As set forth below, several items of evidence were found at this address and authorization to search these items is sought herein.

i.   Delano Williams a/k/a "Dee":  WILLIAMS also distributes drugs for the enterprise.  WILLIAMS was arrested in Tacoma Washington on or about December 11, 2015.

j.   Christopher Meeks a/k/a "Thugga":   "Thugga" is a known member of the enterprise and is featured in rap videos produced by All Da Time Entertainment.   "Thugga" was believed to be living at 1902 Karluk Street apartment B.   On December 9, 2015, a search warrant was executed at this apartment and Meeks was not there.   However, several items were found that appeared to belong to either Meeks, or his girlfriend, Malia GREEN.   Ultimately, Meeks was located at 3830 Parsons Street, apartment 3.   A search warrant was obtained and executed at this residence, and items were seized that are the subject of this application.

30

k. Malia Green: Green is the girlfriend of Christopher Meeks and helps him distribute drugs. Green was believed to be living with Meeks at the 1902 Karluk Street #B address. She was arrested on December 9, 2015, driving Meeks' Dodge Charger. A firearm was found under the driver's seat.

l. Larry Meeks a/k/a "Byrd": "Byrd" is a convicted felon and is a close associate of Holloway, Moore and Walton. "Byrd" is the older brother of Christopher Meeks and is currently incarcerated on separate federal charges. "Byrd" appears in All Da Time Entertainment rap videos. According to a CS, both "Byrd", "Thugga", and "Boogie" are suspected of being involved in a retaliatory homicide committed by the enterprise.

m. Karl Maddox Jr a/k/a, "P": Maddox distributes drugs for the enterprise. Maddox is a convicted felon. On December 9, 2015, Maddox was arrested at 1012 West 53rd Ave #4, where agents executed a federal search warrant. As set forth below, several items of evidence were found at this address and authorization to search these items is sought herein.

n. Corey Peterson. Peterson is an associate of the Meeks brothers. Peterson appears in All Da Time Entertainment videos. Peterson's fingerprint was found on a firearm commingled with other stolen firearms.

o. Darrell Franklin a/k/a "Fairview Boe": Franklin is alleged to be involved in drug distribution was also involved in a shooting on August 28, 2015, in which "Boogie" was believed to be the shooter.

## Double Homicide

56. On 1/27/2015, Anchorage Police Department responded to 6130 East 41st Ct #4 reference a shooting. A female caller stated she had been sleeping in the residence with her husband, kids, brother in-law and his fiancé when she was woke up by the sound of gun fire.

57. Anchorage Police responded and discovered multiple shell casings on the floor in the common area of the four-plex. The shell casings included 7.62x39 and .45 caliber. They were located outside apartment #4 where the door had been forced open as well as inside the apartment.

31

FEB - 3 2016

**58.** Officers found a male subject identified as CHRISTIAN HAYNES on the couch just inside the door of the apartment. HAYNES was deceased and had multiple gunshot wounds to the body and head.

**59.** Also in the apartment was CHRISTIAN HAYNES fiancé KRYSTAL HAWK. HAWK also had gunshot wounds and was transported to Alaska Native Medical center where she was later pronounced dead.

**60.** The caller, APRIL ESCALERA, along with her boyfriend CHRISTOPHER HAYNES were the renters of the apartment. They were both in the apartment at the time of the shooting but were not injured.

**61.** SSTF developed a confidential source ("CS1"), who provided information on the impetus for this murder. CS1 has a prior felony offense, and agreed to cooperate in part to mitigate his exposure on a pending case, but has since ceased efforts at cooperation in exchange for any leniency out of concern for his family's safety. However, based upon my participation in the investigation, conversations with other sources, and review of police reports, I believe CS1's information to be reliable. CS1 stated, in substance, that this shooting was related to a string of shootings that dated back to a dispute between CHRISTOPHER HAYNES and MICHAEL REYNOLD, a/k/a "Boogie". According to CS1, REYNOLD was a member of gang based in Fairview, and CHRISTOPHER HAYNES was a member of a separate rival group.

**62.** CS1 described the members of the Fairview gang as being affiliated with the Bloods and said that the shootings started over pride and respect, or lack thereof, for the rival Fairview gang. CS1 stated that the dispute that led to the shootings began with a fight on or about Halloween 2011 in the Millennium Club. The fights resumed in or about fall 2014, including a shooting at the Kodiak Café. Investigators were able to confirm through police dispatch a fight on October 30, 2011, at the

32

Millennium Club, as well as a shooting in the area near the Kodiak Café on December 28, 2014. CS1, and others CS1 knew, would monitor the social media postings of REYNOLD and others for information regarding the hostility between the Fairview gang and the rival gang. For example, at one point, CS1 reviewed a Facebook posting from REYNOLD that indicated that REYNOLD was going to start going to church and stop drinking.

### Shootings at 4478 Reka Drive and 4030 San Roberto

63.      Three days prior to the double homicide, on 01/24/2015, APD responded to a shooting at 4478 Reka Drive. Several shots were fired at an apartment, which was occupied by CHRISTIAN HAYNES and CRYSTAL HAWK. Both .40 and .45 caliber shell casings were recovered from the scene although nobody was injured in the shooting. CS1 believed that this shooting was perpetrated by the Fairview gang in retaliation for something CHRISTIAN HAYNES said to ISHMAEL HOLLOWAY, a/k/a "Ish."

64.      Later on 1/24/2015, Anchorage Police responded to 4030 San Roberto for another drive by shooting. Officer's located about 50 shell casings in the street. There were .223, 7.62x39 and 9mm shell casings recovered in the street. The target of the shooting was believed to be apartment #4 at the address. Apartment # 4 is where LARRY MEEKS, a/k/a "Byrd", and COREY PETERSON, resided.

65.      A red Dodge pickup matching the description of CHRISTIAN HAYNES' vehicle was described by witnesses as being the suspect vehicle in the shooting.

66.      CHRISTIAN HAYNES' vehicle was located that day at his mother's place on Creekside Center Drive. During a search of the vehicle a .223 magazine was found in the vehicle, although CHRISTIAN denied any knowledge of the shooting.

33

FEB - 3 2016

67.     During the processing of the double homicide scene, 6130 East 41st Ct #4, several guns were recovered in the snow outside the apartment building. Those guns included a Springfield XD40 caliber and an FNX 45 caliber. These guns were among several that had been reported stolen from a previous burglary in Eagle River. The Alaska State crime lab confirmed those two handguns were the same guns used in the initial shooting on Reka Drive. They were also confirmed as being used in the homicide.

68.     A 9mm handgun (found in a bedroom used by CHRISTOPHER HAYNES) and a 7.62 rifle (found in a storage unit outside the apartment) were also located at the scene of the homicide. The Alaska State Crime lab confirmed those guns were used in the shooting on San Roberto Drive (the middle shooting).

## FIREARMS RECOVERED FROM 5901 East 6th Ave

69.     On 01/29/2015, a citizen called to report several guns under a neighbor's deck outside a trailer park 5901 E. 6th Avenue. The citizen stated he/she thought it was suspicious and had also called to report a disturbance with the neighbor, DONALD MOORE.

70.     DONALD MOORE is a close associate of CHRISTOPHER MEEKS and other members of the gang. MEEKS, along with COREY PETERSON, lived just across the street from MOORE.

71.     When police contacted MOORE he denied knowledge of any guns and asked that police take them. Nine guns were found wrapped up in a sheet under MOORE's residence. Some of the guns recovered were reported stolen in the same Eagle River burglary in which the murder weapons from the double homicide were stolen.

72.     When processing the recovered firearms a latent print was found on one of the firearms. A database indicated the print had been left by COREY PETERSON.

FEB - 3 2016

## REYNOLD CONNECTION TO THE DOUBLE HOMICIDE

**73.** A citizen in the area of the double homicide called in to report clothing which seemed out of place dumped in the street. A hat, gloves and jackets were recovered on Baxter Road at the intersection with Eastwood Court which is the next road to the south of where the homicide occurred.

**74.** The state of Alaska crime lab was able to create a DNA profile based on a hair taken from 1 of the recovered gloves. When the profile was entered into a database it was a match for Michael Reynold (Boogie).

### February 25th 2015 traffic stop

**75.** On 2/25/2015, Anchorage Police conducted a traffic stop on a white Lincoln Navigator driven by ISHMAEL HOLLOWAY, a/k/a "Ish". Also in the vehicle were ISAIAH HOLLOWAY, a/k/a "Z" or "Zaya", and DEARON WALTON, a/k/a "Hop" or "Hopout." to CS#1. Also in the vehicle were ISAIAH HOLLOWAY and DEARON WALTON.

**76.** According to his California ID card, WALTON is from Los Angeles, California. WALTON has appeared in rap videos produced by All Da Time Ent. and goes by "Hopout" in the videos, which are posted on YouTube. WALTON has been in videos with other members of the gang in Alaska as well as California. The videos with WALTON show graffiti associated with the Campanella Park Piru (CPP) Bloods. People seen in the videos are dressed in red (consistent with membership in the Bloods street gang) and talk replacing the Letter "C" with the Letter "B" (i.e instead of "Crazy", they say "Brazy").

**77.** The videos with WALTON show graffiti associated with the Campanella Park Piru Bloods. People seen in the videos are dressed in red and talk replacing the Letter "C" with the Letter "B" (i.e



35

FEB - 3 2016

instead of Crazy they say Brazy) Members of the blood gang use this language when talking so as to not use the letter "C" which is the first letter of their rival gang the Crips.

**78.** During the traffic stop officers located a stolen handgun under ISHMAEL'S seat. A search warrant executed on the vehicle resulted in the seizure of a digital scale with heroin residue and about $13,000.00 cash as well as six several cell phones.

**79.** A subsequent warrant was served on cell phones including one believed to belong to WALTON. Several photos were on the phone along with video. The videos show members of the Fariview MOB waiving guns (including at least two felons holding guns) and money along with suspected drugs. They also reference "Fairview to Bompton" and flash gang signs.

### Sex Trafficking Investigation

**80.** On 03/30/2015, acting on a tip generated by the National Center for missing and exploited children, a juvenile female was found in an Anchorage Hotel room. The juvenile was interviewed as a potential victim of sex trafficking, and said she had met a male named "Zaya." That person was identified as ISAIAH HOLLOWAY from a photograph. The female also talked about a male named DORIAN TOPPS and being at his house where she met Zaya. The female said after meeting Zaya he sent her a Facebook message promising her she would always have a place to stay and could make lots of money working for him. The female said the account used for the messages was from the "All Da Time Ent"

**81.** The female also talked about a male named DORIAN TOPPS. The female met "Zaya" at TOPPS' house. The female said, after meeting Zaya, he sent her a Facebook message promising her that she would always have a place to stay and could make lots of money working for him. The female said the account used for the messages was from "All DaTime Ent". WALTON'S Facebook page is

36

FEB - 3 2016

Itsyaman Mitchbitxh based on photos and commenting with other members. Viewing his Facebook page (open to the public) he uses "#326, #FvtoBompton as well as references to Bloods from "Bompton" California.

82.     The juvenile female said she met with HOLLOWAY who was also with a male called "Mitch". From my participation in the investigation, I know that "Mitch" is the name used by DEARON WALTON, who also goes by Hoppy or Hop in rap videos posted on the internet. CS1 also was shown a photograph Walton, who she identified as "Mitch."

83.     The female said the group had targeted other young females as well via Facebook.com. Investigators obtained previous federal search warrants on both TOPPS' and ISAIAH HOLLOWAY's Facebook accounts, but have been unable to verify this fact.

## Drug Purchases by CS2

84.     In March 2015, a confidential human source ("CS2") began providing information about drug distribution on members of the gang, including ISAIAH HOLLOWAY, ISHMAEL HOLLOWAY, LAMONT MOORE,  DORIAN TOPPS, MICHAEL REYNOLD, FELTON REYNOLD, and other members whose names the source did not know.

83.     CS2 is cooperating with police in hopes of receiving consideration on a State of Alaska felony drug charge.   CS2 has prior misdemeanors in the past ten years for shoplifting and giving false information to the police, and other indications of dishonesty.   However, I believe CS2's information is credible, based upon the monitoring of drug deals by law enforcement and other information I have collected during the investigation.

FEB – 3 2016

84. The source provided a phone number (the "dealer phone") that was used to set up purchases of controlled substances. Controlled buys were conducted with ISHMAEL HOLLOWAY, ISAIAH HOLLOWAY, LAMONT MOORE, DORIAN TOPPS and others by calling this same phone number. On the following dates, CS2 made drug purchases from the following individuals at the following places, which were monitored and recorded by law enforcement:

a.      On March 17, 2015, CS2 called the dealer phone, which was answered by ISHMAEL HOLLOWAY, who later met CS2 in an alley close to 901 E. 15th Avenue in Anchorage. ISHMAEL arrived in a black Lincoln Towncar and sold CS2 one gram of heroin in exchange for $175.

b.      On March 20, 2015, CS2 called the dealer phone and was directed to the same alley, where CS2 was met by the black Lincoln Towncar driven by ISHMAEL HOLLOWAY. CS2 later identified Dorian TOPPS as a passenger in the vehicle. CS2 again purchased one gram of heroin.

c.      Later on March 20, 2015, CS2 arranged another drug purchase by calling the dealer phone. CS2 was directed to meet at 905 Richardson Vista, #2 to purchase drugs. Prior to CS2 going to the location, police surveillance observed both ISAIAH HOLLOWAY and ISHMAEL HOLLOWAY arrive at the location. CS2 purchased heroin from ISHMAEL HOLLOWAY.

d.      On April 24, 2015, CS2 was directed to call the dealer phone to arrange another drug purchase. According to CS2, the dealer phone was answered by "Moose", who was later identified by the CS as Lamont Moore from a photograph. CS2 was then directed to the area of 12th and Medfra, where CS2 purchased heroin from Lamont MOORE and ISAIAH HOLLOWAY, who arrived at the location in a white Chevy Pickup truck.   At the time, investigators observed that ISHMAEL HOLLOWAY's Facebook page, "Ovt Ish", indicated that ISHMAEL had flown to California.

38

FEB - 3 2016

e. On April 28, 2015, CS2 called the dealer phone and was directed to 905 Richardson Vista #2. Surveillance units observed ISAIAH HOLLOWAY and DORIAN TOPPS arrive at the location prior to the buy. ISAIAH HOLLOWAY sold heroin to CS2.

f. On April 29, 2015, CS2 called the dealer phone, which was answered by Dorian TOPPS, who directed CS2 to the area of 12th and Medfra. ISAIAH HOLLOWAY arrived driving the white Chevy pickup truck, and sold CS2 two grams of heroin.

85. To facilitate the above drug trafficking investigation, a State of Alaska search warrant for a GPS tracker was obtained and attached to the Lincoln Town car used by ISHMAEL HOLLOWAY to deliver drugs to the source. The GPS tracker data showed HOLLOWAY made frequent trips by 1108 E. 12th Ave., Anchorage, Alaska.

86. According to CS2, the 1108 E. 12th address is the residence of other members of the gang, MICHAEL REYNOLD ("Boogie") and FELTON REYNOLD (Fairview June). CS2 advised that Isaiah HOLLOWAY supplied drugs to the REYNOLDS for them to sell at the 1108 E. 12th address.

87. In July 2015, CS2 advised that he was given another cellphone number to call if CS2 needed drugs. At the time, ISAIAH HOLLOWAY, ISHMAEL HOLLOWAY, LAMONT MOORE, and DORIAN TOPPS were all in custody on state charges from incidents described below. On the following dates, CS2 called this new dealer phone and made the following purchases of controlled substances. These purchases were monitored and recorded by law enforcement:

a. On July 9, 2015, CS2 called the new dealer phone and was directed to the 1108 E. 12th address, where CS2 purchased 2 grams of heroin from Michael REYNOLD.

39

b.      On July 10, 2015, CS2 called the new dealer phone, which was answered by Michael REYNOLD. REYNOLD stated he was not at the address, and advised CS2 that someone else at the residence would take care of it. CS2 went to 1108 E. 12th address, where FELTON REYNOLD sold CS2 heroin.

c.      On July 15, 2015, CS2 called the new dealer phone, was directed to the 1108 E. 12th address, where CS2 purchased heroin from MICHAEL REYNOLD.

d.      On July 30, 2015, CS2 called the new dealer phone, was directed to the 1108 E. 12th address, where CS2 purchased approximately four grams of crack cocaine from MICHAEL REYNOLD and a man later identified as ANGELO CHARTER.

e.      On August 20, 2015, CS2 called the new dealer phone, went to the 1108 E. 12th address, and asked for one ounce of crack cocaine. CS2 was directed to come back a little while later, as they did not have that much crack cocaine available. Surveillance units observed a man, later identified as DELANO WILLIAMS, a/k/a "D", leave in a vehicle driven by a female later identified as BRITTANY HIXSON. The vehicle drove to 1500 West 25th Ave., and WILLIAMS went inside, returned a short time later, and drove back to 1108 E. 12th Ave. CS2 then arrived back at that residence, and WILLIAMS and REYNOLD sold CS2 approximately 22 grams of crack cocaine.

f.      On August 28, 2015, CS2 called the original dealer phone, as ISAIAH HOLLOWAY had made bail on his pending state cases. CS2 was directed to meet in the area of Northern Lights and Boniface, where CS2 contacted ISAIAH, who was the passenger in a red Pontiac driven by Sarah Quinones. In the back seat was Angelo CHARTER. CHARTER sold CS2 7.5 grams of crack cocaine.

g.      On October 8, 2015, CS2 was instructed to call the target phone utilized by Z and to arrange the purchase of controlled substances; CS2 was advised to go to the area of 11th and Medfra.

40

FEB - 3 2016

Surveillance units set up with a view of 1109 Medfra Street apartment #7 where ANGELO CHARTER is known to be living. CHARTER was observed by surveillance walk out of apartment #7 and over to the alley just to the north of the complex. CHARTER sold approximately 8 grams of crack cocaine to CS2 before returning to apartment #7.

h.      On October 15, 2015, CS2 advised he/she was able to purchase controlled substances from CHRISTOPHER MEEKS a/k/a "Thugga". CS2 advised that although Thugga had a separate cell phone to call that the drugs would be supplied by other members of the gang if Thugga did not have the amount. That day, CS2 purchased approximately 1.7 grams from MALIA GREEN; the transaction was arranged over the phone by CHRISTOPHER MEEKS.

i.      On October 21, 2015, CS2 was instructed to place a call to MEEKS and arrange the purchase of controlled substances. CS2 was directed to meet at 1902 Karluk unit #B where MEEKS was reported to be living along with GREEN. Once at the residence MEEKS advised CS2 to follow him to pick up the drugs. MEEKS drove to 1012 West 53rd Ave to pick up the controlled substances. CS2 reported the residence belonged to "P" and "Lup," both members of the gang. Surveillance observed KARL MADDOX Jr a/k/a "P" arrive in a white Chevy Tahoe (ETE155). MEEKS the met CS2 at the passenger side of his Dodge Charger where he sold approximately 7.3 grams of crack cocaine.

j.      On October 27, 2015, CS2 was instructed to contact MEEKS to arrange the purchase of controlled substances. CS2 went to 1902 Karluk #B where MEEKS was reported to be staying along with GREEN. CS2 followed MEEKS to 1109 Medfra, where MEEKS entered apartment 7 and, when he came out, sold approximately 23.8 grams of cocaine to CS2.



FEB - 3 2016.

k.     On November 5, 2015, CS2 was instructed to call KARL MADDOX Jr a/k/a "P" and arrange the purchase of controlled substances. CS2 was advised to meet at 1012 West 53rd Ave #4.  CS2 went to apartment #4 where Maddox sold CS2 approximately 7.5 grams of crack cocaine.

l.     On December 2, 2015, CS2 advised the target cell phone which is normally used to contact ISAIAH HOLLOWAY (907-744-0854) was now being answered by FELTON REYNOLD a/k/a "Jun".  CS2 placed a call to the target cell phone and was instructed by "Jun" to meet at 1108 East 12th Ave. CS2 went into the address and FELON REYNOLD sold CS2 approximately 6.8 grams of crack cocaine.

### May 3rd, 2015 Shooting

**88.**     On 05/03/2015, APD officers were on performing surveillance on an unrelated case in Mountain View.  Officers recognized ISHMAEL HOLLOWAY'S black Lincoln Town car, which appeared to be chasing after a blue Ford Mustang. A short time later APD dispatch advised there was a call in the area of 8th and Karluk for a male shooting out the passenger side of the black Lincoln Towncar at the blue Ford Mustang.

**89.**     Officers stopped the Lincoln, which was being driven by DORIAN TOPPS.  ISHMAEL HOLLOWAY was the passenger.  Officers recovered a Glock handgun with an extended magazine on the front passenger floorboard of the vehicle, near HOLLOWAY.  HOLLOWAY claimed possession of the gun.  The gun was the same caliber as casings found at the scene of the shooting.

**90.**      A phone in the vehicle  had a text message on the screen which had been sent from "Thug"(Christopher Meeks). The message read "Tell Tai I got the drop on that nigga that took his bread".  Tai is known by law enforcement to be AHMODJATAI BALDWIN, an associate of HOLLOWAY.

42

**91.** HOLLOWAY and TOPPS were arrested on state charges related to the shooting. Officers seized six ½ gram packages of heroin from HOLLOWAY's person.

## May 18th 2015 Shooting and Seizure of Drug Evidence

**92.** On 05/18/2015, APD dispatch received a call for a shooting in the parking lot of 801 Karluk Street. Police located a male victim who had a gun shot would to the arm.

**93.** The victim stated he was a "Crip" and had been shot because he was in Blood territory being in Fairview. The victim stated he had driven by a house roughly matching 1108 East 12th Ave where he saw several people outside. The victim stated he had pulled in the parking lot up the street to wait for someone when a sedan pulled up and the passenger of the sedan shot him. The victim described a male that matched the description of LAMONT MOORE. A photo lineup was presented to the victim, who positively identified MOORE, a/k/a "Moose".

**94.** Further investigation and recovery of video evidence confirmed MOORE was the shooter and ISAIAH HOLLOWAY drove the vehicle.

**95.** On May 19, 2015, a search warrant was obtained on 905 Richardson Vista #31, which had been identified during the drug investigation as a possible stash house for the members of the gang. As set forth above, at least two controlled drug purchases by CS2 took place in that building. A search warrant was also obtained for the white Chevy Silverado pickup truck belonging to ISAIAH HOLLOWAY. A firearm was found in the vehicle

**96.** As police were preparing to execute the search warrants, officers observed ISAIAH HOLLOWAY and LAMONT MOORE coming out of the apartment building.



43

FEB – 3 2016

97.     During execution of the search warrant, officers seized approximately 209.63 grams of heroin, 124 grams of cocaine and 39.59 grams of crack cocaine, along with cash, a money counter, receipts and bank account information. In the apartment approximately 209.63 grams of heroin, 124 grams of cocaine and 39.59 grams of crack cocaine were recovered along with cash, a money counter, receipts bank account information, and numerous cellphones and a computer.

98.     Another search warrant was executed at the home of ISAIAH HOLLOWAY at 4210 Mountain View Drive #8. The vehicle used in the shooting, which was a rental vehicle, was seized. Officers seized a gun from the apartment along with a quantity of heroin. Another search warrant was executed at the home of ISAIAH HOLLOWAY at 4210 Mountain View Drive #8. The vehicle used in the shooting, which was a rental vehicle, and gun were recovered from the location along with more heroin.

99.     ISHMAEL HOLLOWAY, who was on release conditions for the pending state shooting case, along with MICHAEL REYNOLD, were seen leaving the Mountain View apartment building with a bag of items. The bag contained cleaning supplies, and it appeared the men were attempting to destroy evidence.

## AUGUST 28 SHOOTING

100.    On August 28, 2015, APD received a 911 call regarding a shooting behind the Playhouse club near 3rd Avenue and C Street. Officers identified a white Caprice owned by Darrell Franklin, a/k/a "Fairview Boe", as the owner of the vehicle that was involved in the shooting. There was a dispute between the passenger of the white Caprice and the driver of another car. The driver of the other car was shot by the passenger of the white Caprice, who fled the area on foot.

101.    Along the route in which the shooter fled, officers found a firearm. Across the street, officers found the identification of MICHAEL REYNOLD, a/k/a "Boogie." REYNOLD matched the

description of the shooter, but was not picked out of a lineup by the victim, who was hospitalized with gunshot wounds to the upper torso and head.

## FINANCIAL INVESTIGATION

**102.** FBI SSTF members have been working with IRS Special Agent Kyle Pudge, who has subpoenaed bank accounts and other records pertaining to Fairview MOB members' financial transactions. Wells Fargo Bank provided the following information as it relates to the investigation. Special Agent Pudge has advised SSTF of the following:

     a.     On or about January 1, 2013, ISAIAH HOLLOWAY opened Wells Fargo Bank account 2409775729. According to the Wells Fargo Consumer Account Application; Holloway opened the account at the Russian Jack store location in Anchorage, Alaska. HOLLOWAY reported an address of 1208 Denali Street Apt 5., Anchorage, Alaska 99508. Holloway reported his "Current Employer" as "none." Holloway is the sole owner of the account.

     b.     From approximately August 9, 2013 to February 14, 2015, approximately $130,000 cash was deposited in to account 2409775729. The cash deposits were conducted at Wells Fargo stores located in Anchorage, Alaska. The cash deposits ranged in amount from $200 to $8,970. Wells Fargo records indicate HOLLOWAY conducted most, if not all, of the deposit transactions. During that same time period in excess of $110,000 cash was withdrawn from account 240775729 at Wells Fargo stores located in or near Los Angeles, California. Wells Fargo records indicate HOLLOWAY conducted most, if not all, of the withdrawal transactions. The cash withdrawals, in California, generally occurred the same day or within a couple of days of the cash being deposited in Anchorage, Alaska.

     c.     On or about April 22, 2015, ISIAH HOLLOWAY opened Wells Fargo Bank account 1595949627. According to the Wells Fargo Consumer Account Application; Holloway opened the account at the Fifth Avenue store location. HOLLOWAY reported an address of 1208 Denali Street Apt 3., Anchorage, Alaska 99508 on the Account Application. HOLLOWAY reported his "Current Employer" as "Isaiah's 1st Class Ent" on the Account Application. HOLLOWAY is the sole owner of the account.

FEB - 3 2016

d.　　On or about May 2, 2015, at approximately 11:38am, ISAIAH HOLLOWAY deposited $4,000 cash in to account 1595949627 at the Debarr Road Wells Fargo Store location in Anchorage, Alaska. Approximately 22 minutes later at 12:10pm, on the same date; ISAIAH HOLLOWAY deposited $2,000 in to account 1595949627 at the Russian Jack Wells Fargo store location in Anchorage, Alaska.

e.　　On or about May 4, 2015, at approximately 11:15am, ISAIAH HOLLOWAY withdrew $6,000 cash from the Gardena Main Wells Fargo Store location in Los Angeles, California. Wells Fargo surveillance photographs of the transaction indicate two black male adults conducted the transaction. The two individuals have been identified by law enforcement as ISAIAH HOLLOWAY and DEARON WALTON.

f.　　These frequent cash deposits in Alaska, along with frequent cash withdrawals, are consistent with the laundering of drug trafficking proceeds.

## Use of Facebook, Instagram and Youtube

**103.**　　Throughout the investigation, Facebook and Instagram pages of the suspects were monitored for posts that were open to the public. There were several mentions / hash-tags of "Fairview MOB" and "326 Mob". The following are examples of these public postings on Facebook

a.　For example on 09/24/2015, **"Itsyaman Mitchbitxh"** [DEARON WALTON], posted "Hacppy pday to my nigga my brotha my MOB brotha learned a lot from this guy right here…..I wish u will turn up n I love u bro……troop down foe u…#326" [sic]. The picture posted was of ISAIAH HOLLOWAY holding a large amount of cash, which was fanned out in HOLLOWAY's hand.

b.　The picture was "liked" by **"Alldatime Zaya"** [ISAIAH HOLLOWAY], based on photos on the page. According to APSIN, September 24 is also the birthday of ISAIAH HOLLOWAY.

c.　On 09/21/2015, **"Alldatime Zaya"** [ISAIAH HOLLOWAY] posted a photo of himself and LARRY MEEKS Jr., a/k/a "Thugga". The post stated "HAPPY GDAY TO MY BROTHER,

FEB - 3 2016

MY RIGHT HAND N CO-CAPTAIN N THIS SHIT WE BEEN THUGGIN TOGETHER SINCE 13 N ITS BEEN US VS WHOEVER EVEN BEFORE THAT N WE ALWAYS DID OUR GDAYS TOGETHER BT THIS THE FIRST ONE WITHOUT U I MISS U THUG YOULL B HOME SOON LOVE U BRO U THE REALEST" @byrdgame907 #326 #FAIRVIEW #MOB4EVA" [sic]. LARRY MEEKS' birthday is September 21. "@byrdgame907" is LARRY MEEKS' Instagram name.

d. On the same day, "Ovt Ish" posted a photo of Larry Meeks Jr saying "Happy birthday to my big bruva dis MOB shit #326 #YNE" [sic]. "Ovt Ish" is the Facebook screen name for ISHMAEL HOLLOWAY based on photos and identifying information. The Facebook page for "Byrd Johnson" [LARRY MEEKS JR.] was tagged in the post. In Alldatime Zaya's post @byrdgame907 was tagged, which is the Instagram account for LARRY MEEKS.

e. During mid-May, 2015, a video was posted by Fairview_Money [DORIAN TOPPS] on Instagram that showed ISAIAH HOLLOWAY and DORIAN TOPPS saying they were just out "Mobbin" and going out "to collect." There are photos on TOPPS' Facebook page (Dorian Topps) that show TOPPS and ISAIAH HOLLOWAY flashing "FV" with their hands. In my experience with this investigation, I understand "collect" to be a reference to collecting drug debts.

f. When asked about the double homicide, CS1 referenced two Facebook pages used by members of the gang. CS1 stated ISAIAH HOLLOWAY,(Alldatime Zaya) posted a picture on his Facebook page on the night of the homicide that appeared to be an attempt at an alibi. HOLLOWAY also has an Instagram account which uses the screen name of @Alldatime_Zaya. Investigators were unable to confirm this from their review of public postings.

g. CS1also stated a male from Compton who he knew as "Mitch" posted an alibi as well. DEARON WALTON's Facebook account ("Itsyaman Mitchbitxh"), based on my review of photos and posts. CS1 believed WALTON was also at the shooting on Reka Drive. A review of WALTON'S Facebook page, "Itsyaman Mitchbitxh", shows several posts that make reference to his gang affiliation with the Campanella Park Piru Bloods. On 01/27/2015, the day of the double homicide, there was a picture of WALTON that looked

FEB - 3 2016

like he was sleeping. The text read "Boredom has officially takn ovr.....ppl" and showed it was posted via Instagram, under the account name **"Hopout_".**

h.  On 08/26/2015, **"Thugga Meeks"** [CHRISTOPHER MEEKS] posted the following on Facebook, which resulted in the following exchanges:

Everybody saying "Free" this nigga and that nigga that ain't never put no work in for the Hood but my bro and big cuzzin was really riding and got real charges I ain't heard shit yet but niggaz stay riding they dick!!! I got y'all tho.#FREEBYRDGAME #FREELILTEE" .

Based on my familiarity with the investigation, MEEKS is referring to LARRY MEEKS, Jr. and TERRANCE DAVIS, who were then in custody on federal charges,

i.  **"Itsyaman Mitchbitxh"** (DEARON WALTON) then commented on that post, stating:

"I love all my niggas n a risk for all my niggas" and "We just need to kall up a round table 32bix Thugga Meeks we n it for each othr bro for u foe byrd z n so on..... niggas that's here we gotta keep this shit solid n together a nigga missk bein out there witchu niggas bro.... n ima see u soon bomptom....." [sic].

Based upon my experience, "kall up a round table" is a reference to a meeting of gang members. The phrase "see u soon Bomptom" is a reference to Meeks going down to Compton, California.

j.  Next, **"Thugga Meeks"** responded, ""I already know #FREEBIGMOOSE #326" and "It's all Mob shit big bro" and "#bompton2fv"" [sic]. I believe "FREEBIGMOOSE" is a reference to Lamont Moore, who was in custody on state charges for the earlier shooting. "Mob shit" is a reference to being a "Member of the Bloods".

k.  Next, **Corey Peterson** responded, "On the hood free my niggaz and if you ain't putting in for my niggaz then keep they name out ya mouth." [sic].

l.  **Itsyaman Mitchbitxh** responded, "It's always gone b mob shit bro..... **Thugga Meeks Corey Peterson** thts wat we signed up foe" and "Evry body go threw a drop on both end losses n ups n dwn but the real niggas we do have gotta say 100 to each othr kus real niggas thts gne depend on us bro..... 32bix" [sic], I believe that the reference to what we "signed up foe" is a reference to gang membership.

m.  **Thugga Meeks** responded, "Already"

48

n. **Alldatime Zaya** [ISAIAH HOLLOWAY] then responded, "I was sayin the same thing....free da guys MOB4eva 4evaMOB"

o. **"Lamont Moe"** is the user name used by LAMONT MOORE on his Facebook page based on photos and user information. Viewing his page shows several photos of MOORE dressed in all red, flashing gang signs and his affiliation to the Campanella Park Piru Bloods. There are also photos of MOORE with ISAIAH HOLLOWAY and other members of the gang. MOORE is also tagged with his Instagram name of **#moose148**, but the page is set so it cannot be viewed without being a "friend" of "moose148".

p. **"FV Jun"** [FELTON REYNOLD] is the screen name used by Felton Reynold based on photos and user information. Photos on the page show FELTON REYNOLD dressed in red with ISAIAH HOLLOWAY, ISHMAEL HOLLOWAY and LARRY MEEKS, Jr. among other unidentified individuals. MEEKS and ISAIAH can be seen showing the "F" hand sign believed to stand for their affiliation with Fairview.

q. On September 15, 2015, **"FV Jun"** posted a picture of Michael Reynold, asking for "Justice For Michael Reynold," referencing Michael Reynold's arrest for double murder. This photo and post was shared by **"Malik Wilson"** [MOHAMMED WILSON], who stated "Free boogy."

r. After the indictment described below was unsealed, Dearon Walton made his Facebook account, **"Itsyaman Mitchbitxh,"** private. He also has changed his Instagram name to "Rosewood_Edition" and made that private as well. Both these accounts were obtained by previous federal search warrant through activity on October 9, 2015.

s. The execution of this warrant revealed that Walton used Facebook to detail his involvement in the crimes under investigation, as well as document his gang membership. The account included numerous photos of individuals in gang colors, as well as individuals using gang signs. Walton, who is a felon, is pictured in several photos with firearms, drugs, and large amounts of cash. As recently as September 25, 2015 (two weeks before the warrant was served), Walton posted a photo of Isaiah Holloway wishing him a "Happy pday" and tagging the number "326" with a photo of Holloway handling a large amount of cash.

49

t. The previous Instagram return on Walton's Instagram account also provides evidence of Walton's association with co-conspirators, as well as illegal activities. For example, as recently as September 21, 2015, Walton posted a photo of Larry Meeks, a/k/a "Byrd," holding a large sum of currency. Underneath the photo, he wrote "free my MOB brother......From Bompton 2 Fairview.....HACPPY PDAY TO MY GANSTA....BYRD.....326." Larry Meeks has been in federal custody on an unrelated federal case.

u. Thus, there is probable cause to believe that both accounts may lead to information about Walton's location as well as participation in the crimes alleged herein, and the information is sought from between October 10, 2015, to present.

## GRAND JURY INDICTMENT

**104.** On 11/17/2015, a federal grand jury indicted 12 members of the Fairview M.O.B on 25 charges including, Drug Conspiracy, Distribution of a controlled substance, Possession of a controlled substance with intent to distribute, Possession of firearms in furtherance of drug trafficking crimes and Money Laundering Conspiracy. The alleged conspiracy spans from January 2012 through the date of the indictment, in November 17, 2015.

**105.** Members included in the indictment are Isaiah Holloway, Lamont Moore, Dearon Walton, Ishmael Holloway, Dorian Topps, Michael Reynold, Felton Reynold, Christopher Meeks, Malia Green, Angelo Charter, Delano Williams and Karl Maddox Jr.

## DECEMBER 9TH 2015 ARRESTS AND SEARCH WARRANTS

**106.** On 12/9/2015, search warrants were served on seven locations as relating to the investigation as well as a consent search of a storage unit. The search warrants were on locations of individuals who were included in the 11/17/2015 Grand Jury indictment. The items now sought to be searched were authorized to be seized in these search warrants, and some were "downloaded" pursuant to the

50

authorization in the search warrant, but not searched. The items found in each search warrant, along with the circumstances of their seizure, are set forth below.

7012 Cape Lisburne Loop

**107.** During the service of the search warrant on 7012 Cape Lisburne Loop (case number 315-mj-00344-KFM), two iPhones (Devices #1 and #2) were located and seized. The Cape Lisburne address was the known residence of Isaiah Holloway, where he was arrested. Devices#1 and #2 were found in the room believed to be occupied by Isaiah Holloway. Also found in the room was $28,073 in cash, a temporary Alaska drivers license for ISAIAH HOLLOWAY, and a small bindle of white powder, believed to be cocaine. A number of additional electronic items were located in other areas of the residence during execution of the warrant, but do not appear to be immediately pertinent to the investigation.

1109 Medfra, Apartment #7

**108.** During the service of the search at 1109 Medfra, Apartment #7 (case number 3:15-mj-00343-KFM), three smart phones (Device #s 3-5), two cellular phones (Device #s 6 and 7), one computer (Device #8), three electronic storage devices/media (Device #s 9-11), and two digital cameras (Device #s 12 and 13) were located and seized. This apartment was the known address for ANGELO CHARTER. CHARTER and his girlfriend were the only ones in the apartment at the time. Also found during the search was an Arizona Iced Tea can with a hidden compartment. The can was found on the bathroom floor open with four plastic baggies containing a white substance believed to be cocaine. Based on my training and experience, this indicative of someone attempting to "flush' narcotics. Found on the kitchen counter of CHARTER's apartment was a small scale, two clear baggies containing a substance believed to be cocaine, and a Sig Sauer P227 handgun. These items were in plain view.

51

FEB − 3 2016

Agents also seized several documents referencing the "Bloods" street gang, including its rules, members, and history.

## 1012 W. 53rd Avenue, Apartment 4

**109.** During the service of the search warrant at 1012 W. 53rd Avenue, Apartment #4 (case number 3:15-mj-00341-KFM), three smart phones (Device #s 14-16), one cellular phone (Device #17), and two computer/tablets (Devices 18 and 19) were located and seized. Apartment #4 was the known address for KARL MADDOX, where controlled purchases were previously made. Maddox and Leonard Moore, a/k/a "Lup", were in the apartment at the time the search warrant was executed. Found in the room MADDOX was occupying was a Ruger Crimson Trace LC9 handgun, baggie containing a white substance believed to be cocaine, a small scale, and $6,325 in cash. Found in the room of the other occupant, Leonard Moore, was a small scale containing suspected drug residue, a small scale, a Grendel Inc. P-12 handgun, and $6,601 in cash. MADDOX and Moore appear to be the only permanent residents of this apartment.

## 400 Turpin, Apartment 3

**110.** During the service of the search warrant at 400 Turpin Street apartment #3 (case number 3:15-mj-00340-KFM), agents seized 3 smart phones (device #s 20-22), 5 computer/tablets (device #s 23-27), and one electronic storage device (device #28). This was the residence of ISHMAEL HOLLOWAY, who was arrested at this location. Also present was his girlfriend, Tanya Moore. Found in the front pocket of a size 4XL jacket (believed to be ISHMAEL HOLLOWAY's) was a small scale. The downstairs portion of the residence appeared to be primarily occupied by children. Accordingly, I do not seek to search the electronic devices found in the downstairs area, which included 2 smart phones and a tablet.

52

## 1108 E. 12th Avenue

**111.**    During the service of the search warrant at 1108 East 12th Ave (case number 3:15-mj-00342-KFM), 8 smart phones (device #s 29-36) and 2 cellular telephones (devices #s 37 and 38) were seized. As set forth more specifically above, this residence was the location of six controlled buys by CS2.   The residence is believed to be the home of FELTON REYNOLD, Jr a/k/a, "Jun", who was arrested at the location during the execution of the warrant.  Prior to his arrest on homicide charges in August, MICHAEL REYNOLD also resided at the location.  Also in the residence at the time of the warrant was Felton Reynold, Sr, Sonya Reynold (REYNOLD'S parents) and Chaka Norman (Reynold's girlfriend).

**112.**    Agents also found items of suspected contraband in the apartment, including a small plastic baggy of suspected crack cocaine, five baggies of marijuana, two containers of marijuana, and a digital scale, all in various rooms upstairs in the residence in the residence, as well as a "crawl space" / utility room in the downstairs of the residence.   The fully furnished area downstairs in the residence appears to be primarily utilized by Felton Reynold, Sr., and Sonya Reynold.   Thus, I do not seek authority to search the devices seized in this area, a smart phone, two cellular phones, three computers/tablets and two electronic storage devices.  All of the other devices were found in rooms where other drug evidence was found, or rooms consistent with dominion and control by FELTON REYNOLD.

## 3830 Parsons, Apartment 3

**113.**    During the service of the search warrant at 3830 Parsons apartment #3 (case number 3:15-mj-00352-DMS), 3 computer/tablets (devices #s 39-41), along with 2 electronic storage devices (device #s 42 and 43) were seized.   The location was found to be a new residence for CHRISTOPHER MEEKS, as he had moved in just days earlier from his prior residence at 1902 Karluk, apartment B. Also living at the residence was SHIRLEY MEEKS and LARRY MEEKS Sr.  Both SHIRLEY MEEKS and LARRY

MEEKS participated in a previous controlled purchase of crack cocaine by CS2. In addition, an assault rifle was seized from the residence.

### 405 Boniface Parkway, Container #554

114.    After being arrested, MALIA GREEN (girlfriend of CHRISTOPHER MEEKS), gave consent to the search her storage unit located at 405 Boniface Parkway, Container #554. During the search four cellular telephones (device #s 44-47) were located and seized. GREEN was present for at least two controlled purchases, and conducted one herself.

### Seizure of 2009 Chevy Silverado

115.    During the inventory following the seizure warrant served for the 2009 Chevy Silverado (case number 3:15-mj-00347-KFM), a Toshiba Laptop (device 48) was located under the rear seat of the vehicle. The vehicle, which was seized during the May 19, 2015 warrant service (see above), has been in the custody of APD since the seizure, and device 48 was found on January 26, 2016. This vehicle was used by ISAIAH HOLLOWAY to facilitate several controlled buys with CS2.

Respectfully Submitted.

Signature Redacted

Special Agent Michael Watson

Subscribed and sworn before me on _____Feb 3_____ 2016,

/S/ DEBORAH M. SMITH
CHIEF U.S. MAGISTRATE JUDGE
SIGNATURE REDACTED

United States Magistrate Judge

54

FEB - 3 2016

## ATTACHMENT A

**In the Matter of the Search of items seized at 7012 Cape Lisburne Loop:**

- iPhone, logged under FBI evidence item 1B85, seized by FBI while executing a search warrant on 12/09/2015 (Device #1)
- iPhone model A1332, logged under FBI evidence item 1B98, seized by FBI while executing a search warrant on 12/09/2015 (Device #2)

The above devices are currently located at the Federal Bureau of Investigation.

FEB – 3 2016

**ATTACHMENT B**

All records on the Devices described in Attachment A that constitute fruits, evidence and instrumentalities of violations of:

a) Title 21, United States Code, Section 841 (a) (1) and 846, the Distribution of Controlled Substances, the Possession of Controlled Substances with Intent to Distribute, as well as the conspiracy to commit those violations;

b) Title 18 United States Code Sections 1956, 1957, Money Laundering, and conspiracies to do the same and aiding and abetting the same;

c) Title 18, United States Code Section 924(c), Possession of a firearm in furtherance of drug trafficking or violent criminal offense;

d) Title 18 United States Code Sections 1961 et. seq., Racketeer Influenced and Corrupt Organizations ("RICO");

e) Title 18 United States Code Section 1959, Violent Crimes in Aid of Racketeering Activities ("VCAR");

f) Title 18 United States Code Section 922(g)(1), felon in possession of firearms; and

The above violations involve All Da Time Ent., Isaiah Holloway, Lamont Moore, Dearon Walton, Ishmael Holloway, Dorian Topps, Michael Reynold, Felton Reynold, Angelo Charter, Delano Williams, Christopher Meeks, Larry Meeks, Jr., Corey Peterson, and Darrell Franklin since January 2012, including information pertaining to the following matters:

1. Call logs, phone numbers in electronic address book;

2. Audio recordings, as well as photographs and videos depicting association of the individuals mentioned above, or association with a gang;

FEB − 3 2016

2

3. Records of parcel shipping (tracking numbers, sender and recipient information);

4. Records evidencing the expenditure of drug related proceeds, namely; receipts, purchase agreements, vehicle information, photographs and/or video recordings of luxury items, jewelry, expensive vacations;

5. Account statements, account summaries, credit card statements, or messages containing account information, account holder and amount deposited, money market accounts, banking information to include routing codes, and deposit receipts;

6. Records of wire service tracking numbers, amounts sent and intended pay-out locations.

7. Records of flight itineraries, airline tickets, airline ticket receipts, messages containing airline confirmation codes, frequent flyer mileage plan cards, and hotel receipts and car rental agreements and receipts.

8. Items tending to establish and document sales of controlled substance activities, namely; customer lists, seller lists, ledgers, tally sheets, pay and owe sheets, price lists, notes and messages detailing same.

9. Address books, messages and documents bearing notations of names and associated telephone numbers, photographs and homemade video clips.

10. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

11. Records evidencing the use of the Internet Protocol address to communicate with other websites, including:



a. Records of Internet Protocol addresses used;

b. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.



FEB − 3 2016

4